Beverly POWELL

v.

HOUSING AUTHORITY OF the CITY OF PITTSBURGH, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 5, 2000.
Decided Aug. 30, 2000.
Reargument En Banc Denied
Nov. 3, 2000.

Thomas M. Hardiman, Pittsburgh, for appellant.

Richard S. Matesic, Pittsburgh, for appellee.

Before: McGINLEY, Judge, LEADBETTER, Judge, and RODGERS, Senior Judge.

McGINLEY, Judge.

The Housing Authority of the City of Pittsburgh (HACP) appeals from the order of the Court of Common Pleas of Allegheny County (common pleas court) that sustained the appeal of Beverly Powell (Powell) from the July 9, 1999, decision of the HACP that terminated Powell's Section 8 housing assistance and granted Powell's

grievance to reinstate her Section 8 benefits.[1]

HACP administers the Section 8 program in the City of Pittsburgh. Powell joined the Section 8 program in 1997. Powell and her three sons, Charles (17), Todd (13), and Terry (9), resided in a Section 8 apartment at 3603 California Avenue in the Brighton Heights section of Pittsburgh.

On August 25, 1998, Charles and Todd carjacked a vehicle in the parking lot of a nearby Giant Eagle supermarket. During the commission of the theft, an elderly woman in the backseat of the car was sprayed with pepper spray and removed from the car. They drove for a short time and parked the car less than four blocks from the Powell residence. Charles and Todd were adjudicated delinquent.

As a result of the carjacking, HACP terminated Powell's Section 8 assistance pursuant to federal regulations that authorize a housing authority to terminate assistance based on violent criminal activity. Powell filed a grievance and stated that she raised her children to the best of her ability and had no idea her two children would commit a carjacking, and that she needed housing assistance for the welfare of her youngest son.

## I.  FEDERAL STATUTES.

Under the congressionally enacted legislation governing Section 8 assistance, the assistance programs are administered by local housing authorities like HACP. 42 U.S.C. § 13661(c) authorizes a *housing authority* or an *owner* of federally assisted housing to deny admission to criminal offenders:

> Except as provided in subsections (a) and (b) of this section and in addition to

any other authority to screen applicants, in selecting among applicants for admission to the program or to federally assisted housing, if the public housing agency or owner of such housing (as applicable) determines that an applicant or any member of the applicant's household is or was, during a reasonable time preceding the date when the applicant household would otherwise be selected for admission, engaged in any drug-related or violent criminal activity or other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or public housing agency employees, the public housing agency or owner may—

> (1) deny such applicant admission or to federally assisted housing.

Additionally, Congress has enacted 42 U.S.C. § 1437f(o)(6)(C) which provides:

> [A] public housing agency may elect not to enter into a contract for housing assistance payments with an *owner* who refuses, or has a history of refusing to take action to terminate tenancy for activity engaged in by the tenant, any member of the tenant's household, any guest, or any other person under the control of any member of the household that—(i) threatens the health or safety of, or right to peaceful enjoyment of the premises by, other tenants or employees of the public housing agency, owner, or other manager of the housing; (ii) threatens the health or safety of, or right to peaceful enjoyment of the residences by, persons residing in the immediate vicinity of the premises; or (iii) is drug-related or violent criminal activity. (emphasis added).

Similarly, where a state contracts to make assistance payments, entered into by

---

1.  The federal government subsidizes housing under Section 8 of the United States Housing Act of 1937, *as amended*, 42 U.S.C. § 1437f. Under the certificate based Section 8 housing program, local housing authorities, such as HACP, make payments to lessors of privately owned rental units and subsidize the rent of

low income families participating in the program. Tenants enter into leases with the landlords, and housing authorities enter into housing assistance payment contracts with the landlords. These contracts are authorized under federal law.

a public housing agency, with an owner of existing housing units, Congress has provided:

> [D]uring the term of the lease, any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other tenants, any *criminal activity that threatens the health, safety or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises,* or any drug-related criminal activity on or near such premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy. (Emphasis added).

42 U.S.C. § 1437f(d)(1)(B)(iii).

## II. FEDERAL REGULATIONS AND SECTION 8 HOUSING "NOTICE OF FAMILY OBLIGATIONS."

The Department of Housing and Urban Development (HUD) has enacted regulations to administer the Section 8 assistance program. 24 C.F.R. 982.551(*l*) provides: "Crime by family members. The members of the family may not engage in drug-related criminal activity, or violent criminal activity (see § 982.553)."[2] 24 C.F.R. § 982.553(a)(2) provides: "At any time, the HA [housing authority] may deny assistance to an applicant, or terminate assistance to a participant family if any member of the family commits: . . . (2) Violent criminal activity." Similarly, 24 C.F.R. § 982.552(c)(i) provides that a public housing authority may terminate program assistance if the family violates any family obligations under the program and refers to 24 C.F.R. § 982.553 concerning termination of program assistance for crime by family members.

On November 13, 1998, HACP heard Powell's grievance and one of its attorneys, Walter Ellison, served as hearing officer. Powell testified regarding the events on the night of the carjacking and stated that as a result of the crime Charles was incarcerated for ten months in Bollingbrook Academy and that Todd received a sentence of six months probation with the condition that he attend another academy after school and on weekends. Notes of Testimony, November 13, 1998, (N.T.) at 2–7; Reproduced Record (R.R.) at 48a–53a.

William Moik (Moik) of the Section 8 department of the HACP testified that the assistance was terminated because members of Powell's family engaged in violent criminal activity. Moik also testified that Powell signed a Section 8 housing "notice of family obligations"[3] which stated that members of the family must not engage in drug related criminal activity or violent criminal activity. N.T. at 8; R.R. at 54a.

## III. HEARING OFFICER'S DECISION–NOVEMBER 30, 1998.

On November 30, 1998, the hearing officer terminated Powell's assistance on the basis that Charles and Todd committed the carjacking and that Powell had signed the "notice of family obligations".

On December 16, 1998, Powell appealed to the common pleas court. On March 26, 1999, Powell's appeal was consolidated with an eviction action filed by Powell's landlord. Powell contended that the testimony at the hearing did not support the findings of the hearing officer. Powell also contended that a housing authority may not terminate rent assistance to a participating family if a member of the family commits violent criminal activity

---

**2.** Powell signed a "Family Obligations" form which states that "Crime by Family members including drug related criminal activity or violent criminal activity is prohibited." Family Obligations—24 CFR Section (982.551) at 2.

**3.** Violent criminal activity is defined as "Any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another." 24 C.F.R. § 882.102.

and that HUD lacked the authority to promulgate such a regulation.

### IV. COMMON PLEAS COURT DECISION–MAY 25, 1999.

The common pleas court characterized the testimony HACP offered at the November 13, 1998, hearing as "vague and incomplete." Common Pleas Court Opinion, May 25, 1999, (Opinion) at 2. The common pleas court reasoned:

A federal agency which administers a Congressionally created program is permitted to make regulations to fill gaps left by Congress. If the regulation is simply filling a gap, the regulation shall be upheld unless it is clearly outside the scope of what Congress would have intended. If, on the other hand, Congress has directly addressed the issue, the court shall strike down any regulation that conflicts with Congress's specific intent. See, generally, *Chevron, USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Opinion at 5.

The common pleas court accurately reviewed the applicable federal statutes and determined:

*There is no legislation which expressly authorizes a housing authority to terminate assistance to a Section 8 tenant based on criminal activity.* Ms. Powell contends that the omission is deliberate. Only the owner is responsible for selecting tenants. *Congress did not intend to permit HUD to require or to authorize a housing authority to interfere with the landlord/tenant relationship between the owner and the recipient of Section 8 assistance based on criminal or drug-related activities by members of the tenant's household.*

I disagree. It is more likely that Congress did not explicitly authorize HUD to act because it believed that the problem that it was addressing (protection of other Section 8 tenants and persons residing in the immediate vicinity of the Section 8 housing) had been solved through the enactment of the legislation authorizing the owner to terminate the lease set forth at pages 5–6 of this Memorandum (42 U.S.C. § 1437(d)(1)(B)).

However, an owner who does not live in the community and may have difficulty obtaining other tenants may not have an incentive to evict a tenant in order to protect persons residing in the immediate vicinity of the Section 8 housing. To the extent that these are the same persons that Congress sought to protect, I defer to the decision of HUD that there was a gap to be filled. (Emphasis added).

Opinion at 8.

The common pleas court then analyzed the applicable statutes and regulations to determine if the scope of the HUD regulations went beyond the scope of what Congress intended. The common pleas court determined:

*The Congressional legislation is a compromise that permits the termination of federally-subsidized housing only where the criminal activity threatens the health, safety, or right to peaceful enjoyment of the Section 8 premises by other tenants or of the residences of persons residing in the immediate vicinity of the Section 8 housing.* (Emphasis added).

Opinion at 9.

The common pleas court determined:

*The HUD regulation that permits a housing authority to deny Section 8 assistance for criminal activities that do not threaten the health, safety, or right to peaceful enjoyment of those residing within or in the immediate vicinity of the Section 8 premises, conflicts with Congressional intent as set forth in 42 U.S.C. § 1437f(d)(1)(B) and in 42 U.S.C. § 1437d(l)(6). For these reasons, I will construe the HUD regulations authorizing a housing authority to terminate assistance to a Section 8 participant family if any member of the family*

commits violent criminal activity to apply only to that criminal activity described in the HUD regulations at 24 C.F.R. 982.310 which implements 42 U.S.C. § 1437f(d)(1)(b) at page 6 of this memorandum.

In summary, the legislation governing contracts by public housing agencies with a Section 8 owner (42 U.S.C. § 1437f(d)(1)(B)), the regulation construing this legislation (24 C.F.R. § 982.310), the legislation governing public housing leases (42 U.S.C. § 1437d(1)(6)) and the regulation construing this legislation (24 C.F.R. § 966.4(1)(2)(ii)(A)) permit the termination of the Section 8 assistance only for non-drug criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or of the residences of persons residing in the immediate vicinity of the premises. Any regulations promulgated by HUD that terminate Section 8 assistance for a tenant with an existing lease may not exceed the scope of this legislation and accompanying regulations. (Emphasis added).

Opinion at 11. The common pleas court remanded for the making of a full and complete record including detailed information concerning the location of the alleged criminal activity.

## V. HEARING OFFICER'S DECISION– JULY 9, 1999.

HACP held the remand hearing on June 24, 1999. Marion Wise (Wise), the owner of the car that was stolen, testified over a hearsay objection regarding the carjacking of which she did not have first hand knowledge. Wise testified that she lived approximately four blocks from Powell's residence and that the Giant Eagle where the incident occurred was in her neighborhood. Notes of Testimony, June 24, 1999, (N.T., 6/24/99) at 12–13; R.R. at 67a–68a. Phares Hutton, an investigator for HACP, testified that carjacking was a felony and considered a violent offense. N.T., 6/24/99 at 18; R.R. at 73a. Donna Sunday (Sun-

day), housing assistant specialist for HACP, described the Section 8 briefing process for prospective Section 8 recipients in which the prospective recipients are advised of the HACP policy with respect to criminal activity. Sunday testified that she did not recall meeting Powell but identified a form signed by Powell entitled "Family Obligations, 24 CFR § 982.551". N.T., 6/24/99 at 22–24; R.R. at 77a–79a. Moik testified that the Giant Eagle was .8 miles from Powell's residence. N.T., 6/24/99 at 28; R.R. at 83a. Moik also testified that Wise lived .2 miles from Powell's residence. N.T., 6/24/99 at 29; R.R. at 84a. Jackie Cannavine, customer relations management specialist for HACP, testified that she conducted briefings for Section 8 recipients concerning limitations on criminal activity, but did not recall if she ever briefed Powell. N.T., 6/24/99 at 33–34; R.R. at 88a–89a.

Powell testified that she was unaware that the carjacking would lead to the termination of Section 8 benefits. N.T., 6/24/99 at 37–38; R.R. at 92a–93a. She also testified that her sons involved in the carjacking no longer lived with her. N.T., 6/24/99 at 40; R.R. at 95a.

The hearing officer made the following relevant findings of fact:

2. Ms. Powell attended a Section 8 briefing session on September 16, 1997 where she was briefed concerning the parameters of the Section 8 program including the Family Obligations of the Section 8 program.

3. Ms. Powell signed a Family Obligation Form after her briefing on September 16, 1997. At that time, the only documents that Ms. Powell was required to sign were the Section 8 Voucher, the Lead Based Paint Information Form and the Family Obligations Form.

4. Ms. Powell's sons, Charles and Todd Bonner, car jacked a car owned by Ms. Wise in that they, [sic] physically overpowered the 75 year old mother of Ms. Marion Wise, unlawfully took possession

of Ms. Wise's car and left with the car on the evening of August 25, 1998.

5. The incident occurred at the local Giant Eagle store, which is approximately 3500 feet straight line distance from the Powell residence. The Giant Eagle is approximately 0.8 miles, 4224 feet from the Powell residence by car travel.

6. The total amount of time necessary for Charles and Todd to walk to the Giant Eagle, overpower Ms. Wise's mother, take possession of the Wise car, drive the car to another location in the community and to walk from the point that they left the car back home was no more than 20 minutes.

Hearing Officer's Decision, July 9, 1999, Ultimate Findings of Fact Nos. 2–6, at 7–8.

The hearing officer determined that Powell signed the "Family Obligations Form" and was aware that violent criminal activity by family members was prohibited. The hearing officer also determined that carjacking constituted violent criminal activity and that it took place in the *immediate vicinity* of the *Powell residence.* Consequently, the hearing officer denied Powell's grievance.

## VI. COMMON PLEAS COURT DECISION–NOVEMBER 23, 1999.

The common pleas court sustained Powell's appeal and granted her grievance on the basis that the *criminal activity of Powell's children did not threaten the health, safety, and right to peaceful enjoyment of the premises or of persons residing in the immediate vicinity of the premises:*

Following a review of the decision of the hearing officer, I conclude that, as a matter of law, the findings of fact set forth in the decision of the hearing officer establish that the criminal activity of Ms. Powell's children may not be characterized as threatening the health, safety, and right to peaceful enjoyment of the premises of persons residing in the immediate vicinity of the premises.

The words 'immediate vicinity of the premises' refer to premises that are located in the immediate neighborhood. A location that is approximately a fifteen minute walk (8/10 of a mile/more than ten city blocks) from the premises is not within the immediate vicinity of the premises.

The Housing Authority contends that I should be considering the location where the victims resided, rather than the location where the criminal activity occurred. In this case, the victims were not chosen because of where they lived. Thus, I must consider the location where the criminal activity occurred in deciding whether the criminal activity affects the health, safety, or right to peaceful enjoyment of premises of persons residing in the immediate vicinity of the Powell premises. In addition, the victims' premises (a distance of .2 to .3 miles or several blocks away from Ms. Powell's premises) are not located in the immediate vicinity of Ms. Powell's premises.

The Housing Authority argues that violent criminal activity should always be characterized as criminal activity that threatens the health, safety, or right to peaceful enjoyment of those living in the immediate vicinity of the criminal actor's residence. The Housing Authority contends that this type of criminal activity – regardless of where it is committed— poses a threat to the immediate neighborhood in which the criminal actor lives because of the significant likelihood that the actor will engage in similar criminal activity in his or her immediate neighborhood.

*I find no merit to this argument. Persons who commit street crimes in other locations do not necessarily commit street crimes where they live because of a fear they will be recognized. Furthermore, as a matter of law, the statutory requirement that the criminal activity threatens the health, safety, and right to peaceful enjoyment of persons residing in the immediate vicinity of*

*the premises is met only where the criminal activity occurs in the immediate vicinity of the premises.* (Emphasis added).

Common Pleas Court Opinion, November 23, 1999, at 1–3.

■ HACP contends that the common pleas court erred when it failed to uphold federal regulations which implement congressional intent to protect Section 8 residents and their neighbors from violent criminal actors, that the common pleas court erred when it held that violent criminal activity had to occur in the immediate vicinity of the family's premises before the family's subsidy could be terminated, and that the common pleas court erred when it disregarded the hearing officer's factual finding that the carjacking took place in the immediate vicinity of the premises.[4]

## VII. CHEVRON ANALYSIS.

### A. WHETHER THE REGULATION IMPLEMENTED CONGRESSIONAL INTENT?

Initially, HACP contends that the common pleas court erred because it failed to uphold the federal regulations which implemented Congress' intent to protect Section 8 residents and their neighbors from violent criminal actors. HACP agrees with the common pleas court that the *Chevron*[5] analysis applies. However, HACP asserts that Congress clearly expressed an intent to exclude violent criminals from Section 8 housing. HACP asserts that because Congress has provided that Section 8 housing assistance may be denied to an applicant if the applicant or any household member recently engaged in violent criminal activity, and that Congress has provided that housing authorities may refuse to enter into Section 8 housing assistance payment contracts if the owners do not take action to terminate the tenancies of families who engage in violent criminal activity, therefore, these statutes evidence Congress' intent to exclude violent criminal actors from Section 8 housing. Therefore, HACP believes that the regulations which authorize a housing authority to terminate assistance for violent criminal activity effectuate the intent of Congress.

The common pleas court did not find that the federal statutes authorize a housing authority to terminate assistance for violent criminal activity. For Section 8 housing assistance, Congress enacted legislation that addresses the contract between the housing authority and the owner of the housing unit which requires that the owner state in the lease that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises or by persons residing in the immediate vicinity of the premises results in termination. Clearly, Congress has provided a means for an *owner* of a housing unit who rents to a recipient of Section 8 housing assistance to terminate tenancy on the basis of violent criminal activity.

**4.** Our review is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Zajac v. Altoona Housing Authority,* 156 Pa.Cmwlth. 209, 626 A.2d 1271 (1993), *petition for allowance of appeal denied,* 537 Pa. 627, 641 A.2d 591 (1994).

**5.** In *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States Supreme Court determined that a court confronted with the validity of an administrative regulation must first ascertain congressional intent on the issue which the regulation addresses. If a court can determine congressional intent, then the court must evaluate the regulation in light of that intent and strike it down if the regulation deviates from that intent. If a court is unable to determine congressional intent, then a court must determine whether Congress intended to delegate power and the reasonableness of the agency regulation. If Congress expressly delegated to the agency the power to legislate on the issue, a court then determines whether the regulation is arbitrary, capricious, or manifestly contrary to the statute. If Congress has not expressly delegated legislative power to the agency, the test is whether the regulation is reasonable. *Chevron,* 467 U.S. at 842–845, 104 S.Ct. 2778.

Further, the statutes cited by HACP indicate that a *housing authority* may deny assistance to an *applicant* for Section 8 assistance when the applicant had engaged in violent criminal activity *prior to the time of application.*

■ However, we agree with the common pleas court that Congress did not specifically, by statute, authorize a housing authority to terminate *Section 8 assistance* if one of the *tenants* engages in violent criminal activity.

## B. WHETHER THE COMMON PLEAS COURT SUBSTITUTED ITS OWN JUDGMENT FOR HUD'S?

■ HACP next contends that even if Congress did not specifically express its intent to remove violent criminals from Section 8 housing, HUD's regulations are consistent with the statutory scheme and congressional intent. HACP asserts that the common pleas court substituted its own judgment for the judgment of HUD. HACP reasons that a murderer, rapist, or carjacker living in a Section 8 unit by definition is a threat to his neighbors' safety.

Contrary to HACP's assertion, we find that the common pleas court did analyze the HUD regulation and determined that it was not a permissible construction of the statute because the regulation provided termination of assistance when a recipient of Section 8 assistance or a member of his or her family engages in violent criminal activity where the statute which permitted an *owner* of a Section 8 housing unit to terminate the lease if a recipient engaged in criminal activity which threatened the health, safety or right to peaceful enjoyment by persons residing *in the immediate vicinity of the premises.* The common pleas court reviewed HUD's reasoning underlying the regulation as set forth in the Federal Register where HUD responded to a question whether the regulation conflicted with the legislation:

> The Department [HUD] has not limited the proscribed activities under this rule to activities carried out on or near the premises. Section 8 certificates and housing vouchers are very mobile forms of housing assistance. The holder can lease suitable housing with Federal subsidy assistance anywhere in the PHA's [Public Housing Agency] jurisdiction, in the metropolitan area or in a contiguous metropolitan area. If a PHA [Public Housing Agency] were permitted to terminate assistance for activities on or near the assisted premises, the deterrent effect of this policy would be substantially diminished because the family could lease housing outside where the family member engages in the proscribed activities. Furthermore, if the rule were limited to activities engaged in or near the premises which are being leased with Section 8 assistance, the rule would not authorize a PHA [Public Housing Agency] to deny Section 8 assistance to a former public housing tenant evicted for drug-dealing in public housing (and whose tenancy in public housing was terminated under section 6(*l*)(5)).

55 Fed.Reg. at 28540.

HUD's explanation failed to convince the common pleas court. The common pleas court reasoned that a public housing resident whose lease was terminated had as much mobility as a Section 8 recipient. The common pleas court determined based on the applicable statutes that the regulation in question exceeded the scope of the legislation. We are satisfied that the common pleas court employed the proper analysis.

## C. WHETHER THE COMMON PLEAS COURT ERRED WHEN IT DETERMINED THAT VIOLENT CRIMINAL ACTIVITY MUST OCCUR IN THE IMMEDIATE VICINITY OF THE SECTION 8 RECIPIENT'S PREMISES?

■ Next, HACP contends that the common pleas court erred when it held that violent criminal activity is only cause

for termination of Section 8 housing assistance if it occurs in the immediate vicinity of the Section 8 residence. HACP asserts that the term "immediate vicinity" in the federal statutes concerning the owner of Section 8 housing refers to criminal activity which poses a threat to those living in the immediate vicinity of the criminal's Section 8 unit as opposed to the physical confines of where the crime actually occurred. HACP is correct that the term "immediate vicinity" modifies the location of the housing unit rather than the location of the crime. However, HACP argues the term "immediate vicinity" extends to any violent criminal activity that poses a threat to the perpetrator's neighbors. The common pleas court found that interpretation conflicts with the intent of Congress which indicated that termination of tenancy by the *owner* is warranted when a recipient of Section 8 assistance engages in criminal activity which threatens the "health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the residences." 42 U.S.C. § 1437f(d)(1)(B)(iii). Congress did not state that all criminal activity provides an owner with grounds to terminate the tenancy of a Section 8 assistance recipient. We agree with the common pleas court that in order to terminate assistance a *housing authority* must establish that the recipient engaged in violent criminal activity within the immediate vicinity of the housing unit. HACP's assertion that any criminal activity on the part of a Section 8 recipient threatens the health, safety, or right to peaceful enjoyment of persons living in the immediate vicinity of the recipient was properly rejected as too broad.

HACP adds that this Court in *Housing Authority of City of York v. Dickerson*, 715 A.2d 525 (Pa.Cmwlth.1998), *petition for allowance of appeal denied*, 560 Pa. 676, 742 A.2d 172 (1999) upheld the termination of Section 8 benefits for violent criminal activity without inquiry into the proximity of the locus of the crime to the Section 8 unit. In *Dickerson*, Ernest and Glenie Dickerson (Dickersons), Section 8 recipients, reported on a personal declaration statement that their minor grandson, who resided with them, had been arrested for robbery and burglary. The Housing Authority of the City of York (Authority) notified the Dickersons that it intended to terminate their Section 8 certificate because of the grandson's criminal activity. After a hearing, the Authority affirmed its decision to terminate assistance. The Court of Common Pleas of York County reinstated the assistance certificate and reversed and remanded for the Authority to consider mitigating factors as required in 24 C.F.R. § 982.552(c). *Dickerson*, 715 A.2d at 525–526. The Authority appealed. This Court reversed and held that the Authority had the discretion to terminate the assistance and was not required to consider all factors. *Dickerson*, 715 A.2d at 527.

This Court's decision did not address the issue of "immediate vicinity," but it is not clear that the issue was raised. Therefore, *Dickerson* does not control the present controversy.

■ The HACP also contends that the common pleas court erred when it failed to find that Powell's sons posed a threat to the safety of the neighborhood because the crime took place at a grocery store within one mile of her residence and the victims of the crime live "mere blocks" from the Powell residence. The common pleas court determined that under the applicable regulation the violent crime must threaten the health, safety or right to peaceful enjoyment of the residents *in the immediate vicinity*. The common pleas court construed the term immediate vicinity to mean on the premises or next door. Because the carjacking occurred close to a mile from the Powell residence, the common pleas court reasoned that this violent criminal activity did not pose the required threat to those residing in the immediate vicinity of the premises. We agree.

## VIII. WHETHER THE COMMON PLEAS COURT ERRED WHEN IT DISREGARDED THE HEARING OFFICER'S DETERMINATION THAT THE CARJACKING OCCURRED IN THE IMMEDIATE VICINITY OF THE PREMISES?

■ Finally, HACP contends that assuming that the common pleas court correctly held that violent criminal activity must occur in the immediate vicinity of the premises, the common pleas court erred when it disregarded the hearing officer's factual finding that the carjacking occurred in the immediate vicinity of the premises. HACP asserts this was a proper exercise of discretion by the hearing officer which the common pleas court may not disturb. However, the question of whether the carjacking occurred within the immediate vicinity of Powell's residence is not a factual question. Rather, the question of what constitutes the immediate vicinity and whether the carjacking fell within the definition of immediate vicinity is a question of law properly reviewed by the common pleas court.

Accordingly, we affirm.

### ORDER

AND NOW, this 30th day of August, 2000, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.

Judge LEADBETTER dissents.