812 A.2d 1201

**Beverly POWELL, Appellee**

v.

**HOUSING AUTHORITY OF THE CITY OF PITTSBURGH, Appellant.**

Supreme Court of Pennsylvania.

Argued March 4, 2002.

Decided Dec. 20, 2002.

Thomas Michael Hardiman, Dianna Calaboyias Wyrick, Pittsburgh, for appellant, Housing Authority of City of Pittsburgh.

Richard Stephen Matesic, Pittsburgh, for appellant, Beverly Powell.

Witold J. Walczak, Martha Schaff Helmreich, for appellee amicus curiae, American Civ. Liberties Union of PA.

Evalynn Welling, for appellee amicus curiae, Metropolitan Tenants Organization.

Before: CAPPY, CASTILLE, NIGRO, NEWMAN SAYLOR and EAKIN, JJ.

## OPINION

Justice CAPPY.

In this case, the appellee, Beverly Powell, received tenant-based housing assistance of the certificate type under Section 8 ("Section 8") of the United States Housing Act of 1937 ("Housing Act"), as amended, 42 U.S.C. § 1437f. Pursuant to regulations ("Regulations") promulgated by the United States Department of Housing and Urban Development ("HUD"), the appellant, the Housing Authority of the City of Pittsburgh ("Authority"), terminated Appellee's assistance when two members of her family engaged in violent criminal activity. Concluding that the Regulations as written are excessive in scope, the Commonwealth Court held that a public housing agency ("PHA") may terminate Section 8 benefits only for that violent criminal activity which threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or which threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the Section 8 dwelling. For all the following reasons, we conclude that the Commonwealth Court erred. Accordingly, we reverse and remand for further proceedings.

In the Housing Act, Congress declared that it is this Nation's policy to employ its funds to "remedy the unsafe housing conditions and the acute shortage of decent, safe and

affordable dwellings for low income families", and to vest responsibility, flexibility and accountability in the PHAs, the entities that administer the programs which provide federal housing assistance. *See* 42 U.S.C. § 1437(a)(1)(A)–(C), § 1437a(b)(6). There are several forms of assistance, each with its own features. For example, while public housing assistance is provided to those who lease a unit in a dwelling that a PHA owns and operates, *see* 42 U.S.C. § 1437d(*l*), Section 8 assistance is provided to those who lease a dwelling in the private sector. 42 U.S.C. § 1437f(b),(*o*).

The PHAs admit applicants into the Section 8 tenant-based assistance programs they administer. *See* 24 C.F.R. § 982.4(b). In such a program, applicants select a suitable unit to lease. 24 C.F.R. § 982.1(a)(2). If the PHA approves the tenancy, the PHA and the owner enter into a housing assistance payment contract ("HAP contract") under which the PHA makes rental payments to subsidize occupancy. 24 C.F.R. § 982.4(b). In turn, the owner and the now-Section 8 participant enter into a lease for the subsidized unit. 24 C.F.R. §§ 982.4, 982.308. Unlike public housing assistance, which attaches to the rented unit, Section 8 tenant-based assistance attaches to the tenant. This means that a participant in a Section 8 tenant-based program may move to another dwelling with continued assistance when his assisted lease ends. 24 C.F.R. § 982.314.[1]

Under a final rule ("Rule") issued in 1990, HUD authorized the PHAs "to deny or terminate [Section 8 tenant-based] assistance to applicants and participants in [Section 8] programs if family members engage in drug-related criminal activities or in violent criminal activities." 55 Fed.Reg. 28538 (July 11, 1990).[2] In doing so, HUD sought to further the purpose of the Housing Act to provide eligible persons with

1. In addition to "tenant-based" assistance, Section 8 provides for "project-based" assistance, in which case, rent is paid for families who live in specific housing developments or units. Project-based assistance attaches to the unit, not to the tenant. 42 U.S.C. § 1437f(f)(6); 24 C.F.R. § 982.1(b)(1). The Regulations at issue do not apply to project-based assistance.

2. At all relevant times, "violent criminal activity" was defined as "[a]ny illegal criminal activity that has as one of its elements the use, attempt-

decent, safe, and sanitary housing by encouraging applicants for and recipients of Section 8 benefits to refrain from such activities. *Id.* at 28538–39.

In the late 1990's, the Authority, the PHA for the City of Pittsburgh, admitted Appellee into its Section 8 tenant-based assistance program ("Section 8 Program").[3] Accordingly, Appellee made arrangements to lease an apartment in the Brighton Heights area of Pittsburgh, which the Authority approved. Appellee and the apartment's owner executed a lease agreement for an initial term of twelve and one-half months. In January 1998, Appellee and her three sons began to reside in the assisted unit.

As a Section 8 Program participant, Appellee signed a Notice of Obligations, which set forth the obligations HUD imposed by regulation upon Appellee and her family members ("Family Obligations"). 24 C.F.R. § 982.551 (1998). The Family Obligations provided that "[t]he members of the family may not engage in drug-related criminal activity, or violent criminal activity." 24 C.F.R. § 982.551(*l*) (1998). Under one of the Regulations, the Authority was empowered to terminate assistance for violations of any of the Family Obligations. 24

ed use, or threatened use of physical force against the person or property of another." 24 C.F.R. § 982.4 (1998). At all relevant times, a "family" was, *inter alia*, a "group of persons" that included children. 24 C.F.R. § 982.201(c)(1),(2) (1998).

**3.** Section 8 assistance has been of two types: certificate and voucher. With a certificate, the rental subsidy is generally based on the actual rent of the assisted unit; with a voucher, the rental subsidy is determined by formula. 24 C.F.R. § 982.1(a)(3),(4). Up until October 1998, tenant-based assistance was administered in separate certificate and voucher programs. In October 1998, the separate certificate and voucher programs were merged. Quality Housing & Work Responsibility Act of 1998, Pub.L. 105–276, § 545, 112 Stat. 2461. HUD implemented the merger in October 1999, establishing the Housing Choice Voucher Program. 64 Fed.Reg. 56894. Certificate assistance continues, but PHAs are no longer allowed to enter into contracts for such assistance. 24 C.F.R. § 982.1(a)(1). In Section 8, § 1437f(*o*) presently covers voucher assistance. 42 U.S.C. § 1437f(*o*).

Appellee indicates, and the Authority does not disagree, that she receives certificate assistance. (Appellee's Brief at 14 n. 21). Unless indicated otherwise, the words "assistance", "benefits" and "subsidies" as used in this opinion refer to Section 8 tenant-based assistance of the certificate type.

C.F.R. § 982.552(b)(1) (1998). In addition, at the time of Appellee's termination from the Section 8 Program, one of the Regulations stated that the Authority could terminate assistance if any family member engaged in violent criminal activity. 24 C.F.R. § 982.553(a)(2) (1998).

On August 25, 1998, Appellee's two teenage sons carjacked a vehicle in the parking lot of a supermarket located just under a mile from Appellee's apartment. During its commission, Appellee's sons used pepper spray on the car's elderly occupant and physically removed her from the car. After driving the car from the lot, Appellee's sons left the vehicle on the street some four blocks from Appellee's residence.

As a result, on September 15, 1998, the Authority sent Appellee a notice that her assistance was terminated for violation of the Family Obligations. Appellee filed a grievance. A Hearing Officer in the Authority's Section 8 Department held an administrative grievance hearing and issued a decision on November 30, 1998. The Hearing Officer upheld the termination of Appellee's assistance, finding that Appellee's sons were involved in a carjacking; that Appellee was given notice of the Family Obligations; and that Appellee was in violation of the Family Obligations for criminal activity.

On December 16, 1998, Appellee filed a statutory appeal in the court of common pleas, contending, *inter alia*, that the Regulations are invalid under Section 8 and may not be used to terminate her assistance. It was Appellee's position that while Section 8 authorizes landlords to terminate a tenancy in the event a family member commits certain crimes, it does not allow the PHAs to terminate Section 8 assistance on such a basis. In addition, Appellee asserted that the Regulations exceeded the scope of the legislation which HUD cited to support them.[4]

The common pleas court applied the test the United States Supreme Court set forth in *Chevron USA, Inc. v. Natural*

4. In her December 1998 appeal before the common pleas court, Appellee also contended that the Authority failed to meet its burden of production and burden of proof on several issues at the November 13, 1998 hearing, and that the Regulations violate the federal Constitution. Finding in Appellee's favor on statutory grounds, the common pleas

*Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for analyzing the lawfulness of a federal agency's regulations to Appellee's claim that the Regulations were invalid.[5] While the court rejected Appellee's contention that Congress never intended to permit HUD to interfere with the landlord-tenant relationship by terminating a tenant's Section 8 benefits based on the criminal activities of family members, the court agreed with Appellee that the scope of the Regulations was excessive.

In its *Chevron* analysis, the common pleas court first determined whether there was a gap in Section 8 for HUD to fill. In doing so, the court set forth the terms of three provisions which concern a landlord's ability to end an assisted tenancy: § 1437f(d)(1)(B)(iii) of Section 8; a HUD regulation relating to Section 8, 24 C.F.R. § 982.310; and 42 U.S.C. § 1437d(1)(6), a subsection in the public housing statute. Section 8 in § 1437(d)(1)(B)(iii) stated (and continues to state) that "any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants [or] any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the [Section 8] premises" engaged in by, *inter alia,* a tenant or a member of his household shall be cause for termination of the assisted tenancy. 42 U.S.C. § 1437f(d)(1)(B)(iii).[6] HUD's regulation at 24 C.F.R.

court expressly declined to reach the issue of whether there are any constitutional prohibitions against the Regulations. Common Pleas Opinion of May 25, 1999 at 4.

5. In its opinion, the common pleas court described the *Chevron* test as follows:

A federal agency which administers a Congressionally created program is permitted to make regulations to fill gaps left by Congress. If the regulation is simply filling a gap, the regulation shall be upheld unless it is clearly outside the scope of what Congress would have intended. If on the other hand, Congress directly addressed the issue, the court shall strike down any regulation that conflicts with Congress' specific intent.

Common Pleas Court Opinion of May 25, 1999 at 5.

6. 42 U.S.C. § 1437f(d) sets forth the terms that were to appear in the HAP contract between the Authority and Appellee's landlord. In § 1437f(d)(1)(B)(iii), Section 8 states:

§ 982.310 tracked 42 U.S.C. § 1437f(d)(1)(B)(iii)'s language.[7] The public housing statute in § 1437d(l)(6) required (and continues to require) that a PHA use leases which state, *inter alia*, that "any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants" engaged in by a tenant or a member of his household shall be cause for termination of the public housing tenancy. 42 U.S.C. § 1437d(l)(6).

> 1437f. Low-income housing assistance
> * * *
> (d) Required provisions and duration of contracts for assistance payments; waiver of limitation. (1) Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—
> * * *
> (B)(iii) during the term of the lease, any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants, any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises, or any drug related criminal activity on or near such premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of the tenancy. . . .

42 U.S.C. § 1437f(d)(1)(B)(iii). This subsection also requires a HAP contract to provide that the lease between tenant and owner shall endure for at least one year or for the term of the HAP contract, whichever is shorter; shall contain other terms and conditions the Secretary of HUD specifies; and shall not be terminated except for serious or repeated violations of the lease, applicable Federal, State or local law or for other good cause. 42 U.S.C. § 1437f(d)(1)(B)(i)–(ii).

7. HUD's regulation relating to an owner's termination of a Section 8 tenancy stated in pertinent part:

> § 982.310. Owner termination of tenancy.
> * * *
> (c) Criminal activity. Any of the following types of criminal activity by the tenant, any member of the household, a guest or another person under the tenant's control shall be cause for termination of tenancy:
> (1) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other residents;
> (2) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; or
> (3) Any drug-related criminal activity on or near the premises.

24 C.F.R. § 982.310(c)(1)–(3) (1998).

Next, the court noted that "[t]here is no legislation which expressly authorizes a[PHA] to terminate assistance to a Section 8 tenant based on criminal activity." Court of Common Pleas Opinion of May 25, 1999 at 8. The court reasoned that the source of this omission was Congress' belief that "the problem ... it [Congress] was addressing (protection of other Section 8 tenants and persons residing in the immediate vicinity of the Section 8 housing) had been solved through the enactment of the legislation authorizing the owner to terminate the lease [at 42 U.S.C. § 1437f(d)(1)(B)(iii)]." *Id.* The court concluded, however, that the "problem" of protecting other Section 8 tenants and persons residing in the immediate vicinity of the Section 8 unit had not been solved by 42 U.S.C. § 1437f(d)(1)(B)(iii)'s passage in all cases because an owner who does not live where the assisted dwelling is located may not evict a tenant for fear of not finding a replacement. Thus, the court concluded that there was a gap in Section 8 for HUD to fill with regulations which would authorize a PHA to terminate benefits for criminal behavior. *Id.*

The court then determined whether the Regulations filled Section 8's gap in a permissible fashion. The court concluded that they did not. The court held that any regulations which permit a PHA to terminate Section 8 assistance for violent criminal activity and which do not reflect the crime-based standards for terminating a lease set out in § 1437f(d)(1)(B)(iii) of Section 8 and in 42 U.S.C. § 1437d(*l*)(6) of the public housing statute conflict with Congressional intent. *Id.* at 10–11.

Accordingly, the court "construed" the Regulations to mirror the terms of 42 U.S.C. § 1437f(d)(1)(B)(iii) and the regulation at 24 C.F.R. § 982.310, and held that the Regulations authorizing a PHA to terminate Section 8 assistance for violent criminal activity apply only to that violent criminal activity which threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or which threatens the health, safety, or right to peaceful enjoyment of the premises of their residences of persons residing in the imme-

diate vicinity of the Section 8 premises. *Id.* at 11.[8] Pursuant to 2 Pa.C.S. § 754(a), the court remanded the case to the Authority "for the purpose of making a full and complete record, including detailed information concerning the location of the alleged criminal activity." Court of Common Pleas Order of May 25, 1999.

On June 24, 1999, the Authority held the remand hearing. On July 9, 1999, the Hearing Officer denied Appellee's grievance. Based on the testimony and exhibits he received into evidence, the Hearing Officer found that the carjacking occurred at the local supermarket, which is approximately a straight line distance of 3500 feet from Appellee's residence and approximately 0.8 miles from her residence by car; that the total amount of time necessary for Appellee's sons to walk to the market, overpower the victim, take possession of the car, drive the car to another location and walk from that point back home was no more than twenty minutes; and that the victim's residence and Appellee's apartment are in the same community, and approximately 1100 straight line feet and 0.2 to 0.3 miles by car travel apart. The Hearing Officer concluded that "[g]iven the short period of time, less than twenty minutes and the short distances, less than one mile, over which these events occurred, it is not possible to give practical effect to the HUD regulations and yet consider these activities to not be within the vicinity of the Section 8 unit." Decision of the Hearing Officer of July 9, 1999 at 12.

Again, Appellee filed a statutory appeal with the court of common pleas. Focusing on where the criminal activity occurred, not on the location of the victim's residence, finding that the words "immediate vicinity of the premises" refer to premises that are located in the "immediate neighborhood", and rejecting the Authority's argument that violent criminal activity, regardless of its location, threatens the health, safety, or right to peaceful enjoyment of those living in the immediate

8. In the interests of clarity of expression, in this opinion, the terms from 42 U.S.C. § 1437f(d)(1)(B)(iii) that the common pleas court added to the Regulations are at times referred to as "§ 1437f(d)(1)(B)(iii)'s standard".

vicinity, the court concluded that, as a matter of law, the findings set forth in the Hearing Officer's decision "establish that the criminal activity of [Appellee's] children may not be characterized as threatening the health, safety, and right of peaceful enjoyment of the premises of persons residing in the immediate vicinity of the premises." Common Pleas Court Opinion of November 23, 1999 at 1–2. Thus, by order dated November 23, 1999, the court sustained Appellee's appeal from the Authority's July 9, 1999 decision terminating her Section 8 benefits, and granted her grievance seeking their reinstatement.

The Authority filed an appeal in the Commonwealth Court. The Commonwealth Court panel affirmed, endorsing and tracking the reasoning of the court of common pleas. *Powell v. Housing Authority of the City of Pittsburgh,* 760 A.2d 473 (Pa.Cmwlth.2000). The Commonwealth Court agreed with the common pleas court that "Congress did not specifically, by statute, authorize a housing authority to terminate *Section 8 assistance* if one of the *tenants* engages in violent criminal activity[ ]", and that the Regulations exceed the scope of Section 8 because they allow for termination of assistance for any violent criminal behavior, even though "the statute [42 U.S.C. § 1437f(d)(B)(iii)] permit[s] an *owner* of a Section 8 housing unit to terminate the lease if a recipient engage[s] in criminal activity which threaten[s] the health safety or right to peaceful enjoyment by persons residing *in the immediate vicinity of the premises." Id.* at 481 (alteration in original). The Commonwealth Court also approved of the common pleas court's decision to construe the Regulations to incorporate § 1437f(d)(1)(B)(iii)'s standard, and to apply the Regulations as construed to Appellee's grievance. *Id.* at 481–82. Lastly, after agreeing with the common pleas court that "in the immediate vicinity" means "on the premises" or "next door", the Commonwealth Court concluded that because the "question of what constitutes the immediate vicinity and whether the carjacking fell within the definition of immediate vicinity is a question of law", not a question of fact, the common pleas

court did not erroneously disregard the Hearing Officer's factual findings in this matter. *Id.* at 482–83.

■ The present appeal followed.[9] The Authority raises several issues. First, the Authority contends that contrary to the Commonwealth Court's decision, the Regulations pass the *Chevron* test without § 1437f(d)(1)(B)(iii)'s standard. Second, it argues that even if violent criminal activity must threaten those in the immediate vicinity of the Section 8 premises before assistance can be terminated, that phrase refers to the location of the homes of those who might be threatened by the criminal activity, not to the locus of the crime itself relative to the Section 8 unit. And third, it asserts that the Commonwealth Court should have upheld the Hearing Officer's finding of fact that the carjacking occurred in and threatened those living in the immediate vicinity of Appellee's Section 8 residence inasmuch as the finding was not arbitrary or capricious.

Appellee counters that the Regulations are entitled to no deference under *Chevron* because they do not contain § 1437f(d)(1)(B)(iii)'s standard; that the Regulations violate the federal Constitution; and that the Authority failed to show that the carjacking impacted upon Appellee's next door neighbors.

We turn now to the important question this appeal raises— whether the Regulations are lawful. We begin our discussion by observing that Congress empowered HUD to promulgate rules and regulations consistent with and aimed at advancing the aims of the Housing Act. 42 U.S.C. § 3535(d). Thus, this case involves an administrative agency's interpretation of a statute it administers. Accordingly, the test the United States

9. Where, as here, a complete record was developed before the local agency, the court reviewing the matter on appeal must affirm the local agency unless it is determined that constitutional rights were violated, that an error of law was committed, that the procedure before the agency was contrary to the statute or that necessary findings of fact were unsupported by substantial evidence. 2 Pa.C.S. § 754(b); *Public Advocate v. Philadelphia Gas C'mm*, 544 Pa. 129, 674 A.2d 1056, 1060 (1996). When deciding a question of law, this court's review is de novo and its scope of review is plenary. *See Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

Supreme Court set forth in *Chevron* for determining whether regulations fall within an agency's lawful interpretative authority is the test we must follow. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *see HUD v. Rucker*, 535 U.S. 125, 122 S.Ct. 1230, 1233, 152 L.Ed.2d 258 (2002).

Under *Chevron*, a reviewing court is confronted with two questions. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. But if the court determines that Congress has not specifically addressed the question, the court "does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Where the legislative delegation to an agency to fill a gap is implicit, rather than explicit, a court may not substitute its own construction of a statutory provision for the agency's "reasonable interpretation". *Id.* at 844, 104 S.Ct. 2778. If a regulation is reasonable, it should not be disturbed, unless it appears from the statute or its legislative history that the agency's construction of the statute is not one that Congress would sanction. *Id.* at 844–45 & n. 14, 104 S.Ct. 2778.

With these principles in mind, we begin with the Commonwealth Court's decision. The test the United States Supreme Court articulated in *Chevron* is straightforward: under the first prong, a court must determine whether Congress has addressed the precise question at issue by examining Congress' intent on the matter. *Id.* at 842, 104 S.Ct. 2778. Nevertheless, the Commonwealth Court did not do so. Nowhere in its opinion does the court substantiate the observation, meant apparently to answer *Chevron's* first question, that Congress has not specifically authorized a PHA to terminate a

tenant's Section 8 assistance for violent criminal behavior, with evidence of Congress' intent. *Powell,* 760 A.2d at 481. Under *Chevron's* second prong, a court must determine whether an agency's regulation represents a "permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Here too, the court's opinion is lacking. The sum and substance of the Commonwealth Court's analysis was its conclusion that the Regulations exceed the scope of Section 8 by not incorporating the terms of 42 U.S.C. § 1437f(d)(1)(B)(iii). *Powell,* 760 A.2d at 477, 481. We are of the view that the *Chevron* test requires more from a court than the Commonwealth Court provided. It is, therefore, enough for us to say that the Commonwealth Court did not apply *Chevron* correctly.

Before we apply the *Chevron* framework, however, due to the nature of Commonwealth Court's ultimate determination and judgment, we must clarify the question we are deciding. Ordinarily, the "precise question at issue" under the *Chevron* test is cast in terms of the regulation that has come under challenge. *See Chevron,* 467 U.S. at 840, 104 S.Ct. 2778. This is because the agency's construction of a statute, which has been put at issue as unlawful, is reflected in the agency's regulation. *See e.g., HUD v. Rucker,* 535 U.S. 125, 122 S.Ct. at 1232–33, 152 L.Ed.2d 258; *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. at 125, 120 S.Ct. 1291.

█ In this case, the Commonwealth Court did not hold that the Regulations are unlawful or hold that a PHA may not terminate Section 8 benefits for violent criminal behavior and preclude the application of those Regulations. Rather, the court held that the Regulations as written are inconsistent with 42 U.S.C. § 1437f(d)(1)(B)(iii), and affirmed the common pleas court's decision to rewrite the Regulations to incorporate § 1437f(d)(1)(B)(iii)'s standard, as well as the common pleas court's decision to apply the re-written Regulations to Appellee's grievance. Therefore, the question the Authority's appeal raises is not whether a PHA may terminate Section 8 assistance when a family member engages in violent criminal activity. It is instead, whether a PHA may terminate Section 8 assistance when a family member engages in violent criminal

activity without having to satisfy § 1437f(d)(1)(B)(iii)'s standard and establish that the violent criminal activity threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or threatens the health, safety, or right to peaceful enjoyment of their residences of persons residing in the immediate vicinity of the Section 8 premises. If we were to assess the lawfulness of the Regulations as they were promulgated, and without the Commonwealth Court's addition, we would in effect be issuing an advisory opinion on a question that is not before us and one which is unnecessary to the adjudication of the parties' dispute.[10] This is a practice we have consistently eschewed. *See Commonwealth v. Klobuchir,* 486 Pa. 241, 405 A.2d 881, 884 n. 5 (1979).[11]

We now turn to applying *Chevron's* teaching. With respect to *Chevron's* first inquiry, which asks whether Congress has expressed a clear intent on the precise question at issue, the Supreme Court has instructed a reviewing court to use the traditional tools of statutory construction to ascertain whether Congress has done so. *Id.* at 842–43 & n. 9, 104 S.Ct. 2778. The Court has also instructed that a reviewing court should not confine itself to examining any statutory provision in isolation, but should interpret the statute as a "symmetrical and coherent regulatory scheme." *FDA v. Brown,* 529 U.S. at 132–33, 120 S.Ct. 1291 (quotation omitted). Moreover, because subsequent acts can shape or focus the range of plausible meanings that a statute may have had at the time it was enacted, a reviewing court should consult later legislation, particularly where Congress has spoken more specifically to the topic at hand. *Id.* at 133, 120 S.Ct. 1291.

Both the Authority and Appellee contend that *Chevron's* first prong is satisfied. While the Authority claims that Congress has clearly shown that a PHA may end the benefits

10. At times, the Authority argues more expansively, contending that under *Chevron,* the Regulations as written are lawful. While the lawfulness of the Regulations was challenged broadly speaking, our discussion and ruling are necessarily confined by sound jurisprudential principles to the narrow question we have defined.

11. In view of our holding on the *Chevron* issue, we do not address the issue of whether a court may rewrite a federal agency's regulations.

of a Section 8 Program participant whose family member engages in violent criminal activity without having to satisfy § 1437f(1)(d)(B)(iii)'s standard, Appellee asserts that Congress has clearly demonstrated that a PHA may not terminate benefits unless it makes such a showing.

We turn first to Appellee's position. Appellee begins by stating that in public housing, where benefits are not "mobile", a tenant's eviction for breach of the lease also amounts to a loss of benefits. (Appellee's Brief at 16.) Appellee then states that HUD has seen to it that Section 8 assistance likewise terminates upon breaches of an assisted lease agreement.[12] Based on these statements, Appellee concludes that "Congress and HUD [have recognized] that terminations of housing assistance are effected through *lease enforcement.*" (Appellee's Brief at 16) (emphasis in original). Thus, Appellee asserts, Congress intends for the crime-based standards in 42 U.S.C. § 1437(d)(1)(B)(iii) to govern not only the termination of a Section 8 lease, but also, the termination of Section 8 subsidies. Further, Appellee asserts, these crime-based reasons for lease termination in 42 U.S.C. § 1437(d)(1)(B)(iii) are exclusive and reflect two of Congress' objectives: first, to divide criminal activity into "non-drug" and "drug-related" for purposes of terminating Section 8 assistance; and second, to erect a limited "zone of protection" around each assisted unit with respect to all non-drug crime, so that only those non-drug crimes which "impact" upon persons in the immediate vicinity

12. According to Appellee, since Section 8 assistance attaches to the tenant and continues upon eviction, HUD promulgated regulations allowing the PHAs to terminate Section 8 assistance for lease violations so that benefits terminate in such circumstances. In 1998, one of the Family Obligations provided that a family may not commit any serious or repeated violations of the lease. 24 C.F.R. § 982.551(e) (1998). Under one of the Regulations, the Authority was empowered to terminate Appellee's assistance for violations of any of these Family Obligations. 24 C.F.R. § 982.552(b)(1) (1998). Presently, one of the Regulations states that "[t]he PHA must terminate program assistance for a family evicted from housing assisted under the program for serious violations of the lease." 24 C.F.R. § 982.552(b)(2) (2002).

We set forth Appellee's position for argument's sake. We do not consider the merits of Appellee's assertions concerning HUD's motivation for these regulations.

of the assisted unit may lead to benefits termination by a PHA. (Appellee's Brief at 23–25).

At first glance, Appellee's position has a certain logical appeal. Upon closer scrutiny, however, it remains unsupported. The process of ascertaining Congress' intent, of course, begins with the language of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). In this regard, Appellee does not point to any language in Section 8 or in another federal housing statute which shows that Congress intends for the termination of an assisted lease to represent the sole means of terminating Section 8 assistance or that 42 U.S.C. § 1437f(d)(1)(B)(iii) reflects the totality of Congress' intent with regard to the authority that a PHA may be given to terminate Section 8 benefits for criminal activity. Nor have we located any such language. Likewise, the legislative history to which Appellee directs us is unpersuasive. While all of that history demonstrates that Congress has elected not to alter the crime-based standards for terminating leases in 42 U.S.C. § 1437f(d)(1)(B)(iii) or in 42 U.S.C. § 1437d(*l*)(6), none of it reveals that 42 U.S.C. § 1437f(d)(1)(B)(iii) is the exclusive repository of Congress' intent as to either the benefit termination authority a PHA may be given or the crime-based reasons that a PHA may use to terminate Section 8 assistance. *See, e.g.,* 142 Cong. Rec. H4662–01, 104 Congress, 2nd Sess. (May 9, 1996); H.Rep. No. 102–760, 102nd Congress, 2nd Sess. 7 (1992), *reprinted in* U.S.Code Cong. & Admin.News pp. 3281, 3288.

Significantly, Appellee's basic premise, that Congress intends for the termination of Section 8 benefits by a PHA to amount to no more than "lease enforcement", is belied by 42 U.S.C. § 13662, a statutory provision in which Congress deals only with the authority of the PHAs to end the Section 8 assistance of illegal drug users. *See infra* note 14. Accordingly, we reject Appellee's position.

As to the Authority's assertion that the statutes governing Section 8 housing plainly evidence Congress' intent to permit a PHA to terminate the assistance of violent criminal offend-

ers without meeting § 1437f(d)(1)(B)(iii)'s standard, we start again with the words of the statute, and again, we find no evidence of Congress' intent on the matter. There is no provision or language in Section 8 or related statutes which expressly refers to a PHA's ability to terminate assistance for violent criminal behavior. *See HUD v. Rucker*, 535 U.S. 125, 122 S.Ct. at 1233–34, 152 L.Ed.2d 258 (because 42 U.S.C. § 1437d(*l*)(6)'s plain language unambiguously requires lease terms that give PHAs the discretion to terminate the lease of a public housing tenant when a member of the household or a guest engages in drug-related activity, regardless of whether the tenant knew, or should have known, of the drug-related activity, Congress has directly spoken to whether a HUD regulation may allow for the eviction of so-called "innocent" tenants for the drug-related activity of a guest or household member).

Looking to the history of Section 8 and related legislation for guidance, we observe that when HUD issued the Rule in 1990, Congress had not referred to violent criminal activity as a category of crime nor had it addressed a PHA's authority to deny or terminate Section 8 benefits. Then, in 1998, Congress spoke to these matters, enacting 42 U.S.C. § 13661 and 42 U.S.C. § 13662, provisions that cover safety and security in public and other assisted housing programs, including those administering Section 8 benefits, *see* 42 U.S.C. § 13664, and rewriting 42 U.S.C. § 1437f(*o*), the subsection in Section 8 that covers voucher programs. Under 42 U.S.C. § 13661, a PHA may deny admission into its Section 8 program if an applicant or his family member has engaged in violent criminal behavior during a reasonable time preceding the date when he would otherwise be admitted; [13] under 42 U.S.C. § 13662, a PHA

13. Section 576 of the statute that governs "Residency and Service Requirements in Federally Assisted Housing" provides:

§ 13661.   Screening of applicants for federally assisted housing
* * *
(c) Authority to deny admission to criminal offenders.   Except as provided in subsection (a) [Ineligibility because of eviction for drug crimes] and (b) [Ineligibility of illegal users and alcohol abusers] and in addition to any other authority to screen applicants, in selecting among applicants for admission to the program or to federally

may terminate an illegal drug user's Section 8 benefits and the Section 8 benefits of those whose illegal drug or alcohol use intrudes upon others;[14] under 42 U.S.C. § 1437f(o)(6)(C), a PHA may elect not to enter into a HAP contract for voucher assistance with an owner who refuses to take action to terminate the leases of violent criminal actors; and under 42 U.S.C. § 1437f(o)(7)(D), the HAP contract for voucher assistance is to provide, *inter alia*, that during the term of the lease, any violent criminal activity on or near the Section 8 premises shall be cause for tenancy termination.[15]

> assisted housing, if the public housing agency or owner of such housing (as applicable) determines that an applicant or any member of the applicant's household is or was, during a reasonable time preceding the date when the applicant household would otherwise be selected for admission, engaged in any drug-related or violent criminal activity or other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or the public agency employees, the public housing agency or the owner may—
> (1) deny such applicant admission to the program or to federally assisted housing. . . .
>
> 42 U.S.C. § 13661(c).

14. Section 577 of the statute that governs "Residency and Service Requirements in Federally Assisted Housing" provides in pertinent part:
> § 13662. Termination of tenancy or assistance for illegal drug users and alcohol abusers in federally assisted housing.
> (a) In general. Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing (as applicable) shall establish standards or lease provisions for continued assistance or occupancy in federally assisted housing that allow the agency or owner (as applicable) to terminate the tenancy or assistance for any household with a member—
> (1) who the public housing agency or owner determines is illegally using a controlled substance;
> or
> (2) whose illegal use (or pattern of illegal use) of a controlled substance, or whose abuse (or pattern of abuse) of alcohol, is determined by the public housing agency or owner to interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents.
>
> 42 U.S.C. § 13662.

15. In § 1437f(o)(6)(C) and (7)(D), Section 8 provides:
> § 1437f. Low-income housing assistance
> * * *
> (o) Voucher program.

The Authority contends that since Congress permits a PHA to condition the receipt of Section 8 benefits on an applicant's showing that he and his family members have not engaged in violent criminal activity, encourages owners to end the voucher assisted tenancies of violent criminal offenders without qualification, and advises a PHA to consider not doing business with owners who countenance such persons as tenants, *see* 42 U.S.C. §§ 13661(c), and 1437f(*o*)(6)(C), Congress has shown that it intends for a PHA to end Section 8 assistance when family members engage in violent criminal activity without 42 U.S.C. § 1437f(d)(B)(iii)'s standard.

We cannot accept the Authority's position. The first prong of *Chevron* asks whether Congress "has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. We are simply unable, as the Authority urges, to

\* \* \*

(6) Selection of families and disapproval of owners.
\* \* \*

(C) PHA disapproval of owners. In addition to other grounds authorized by the Secretary, a public housing agency may elect not to enter into a housing assistance payments contract under this subsection with an owner who refuses, or has a history of refusing to take action to terminate tenancy for activity engaged in by the tenant, any member of the tenant's household, any guest, or any person under the control of any member of the household that—
　(i) threatens the health, safety of, or right to peaceful enjoyment of the premises by, other tenants or employees of the public housing agency, owner, or other manager of the housing;
　(ii) threatens the health, or safety of, or right to peaceful enjoyment of the residences by, persons residing in the immediate vicinity of the premises; or
　(iii) is drug-related or violent criminal activity.
(7) Leases and tenancy. Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit—
\* \* \*

(D) shall provide that during the terms of the lease, any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants, any criminal activity that threatens the health, safety or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises, or any violent or drug-related criminal activity on or near such premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy. . . .
42 U.S.C. § 1437f(*o*)(6)(C),(7)(D).

conclude that Congress' clear and unambiguous intent regarding a PHA's ability to terminate the Section 8 assistance of violent criminal actors is revealed through a series of inferences. Further, we find it telling that although Congress has confirmed one aspect of HUD's Rule—a PHA's ability to deny admission into a Section 8 program on the basis of violent criminal activity, *see* 42 U.S.C. § 13661(c), Congress has not confirmed the Rule's other significant topic—a PHA's ability to terminate the assistance provided to Section 8 program participants for violent criminal behavior. In addition, while Congress has addressed the termination of Section 8 assistance and the .category of violent crime in legislation, Congress has not chosen to tie them together in any of its enactments. Finally, Congress' view of violent criminal activity is not as clear-cut as the Authority describes it. Although Congress speaks in unlimited terms in 42 U.S.C. § 1437(o)(6)(C) about owners who fail to end the voucher-assisted tenancies of violent criminal offenders, Congress qualifies its reference to the termination of those tenancies for violent criminal activity with "on or near the premises" in the subsection which follows, 42 U.S.C. § 1437(o)(7)(D).

Thus, we conclude that under *Chevron*, Congress has not plainly and unambiguously expressed its intent as to whether a PHA may terminate Section 8 assistance based on a family member's violent criminal activity without having to meet § 1437f(d)(1)(B)(iii)'s standard.

Accordingly, we turn to the second prong of the *Chevron* test: are the Regulations, insofar as they do not burden a PHA with having to make such a showing before it may terminate assistance, a "permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. As to the second prong, the United States Supreme Court has instructed that a reviewing court "need not conclude that the agency's construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778. The Court has made it clear that "[w]hen a challenge to an agency

construction of a statutory provision really centers on the wisdom of the agency's policy, rather than on whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Id.* at 866, 104 S.Ct. 2778. In the Court's view, "[s]uch deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *FDA v. Brown*, 529 U.S. at 132, 120 S.Ct. 1291 (quotation and citation omitted).

We begin with Appellee's argument on *Chevron's* second prong. Appellee first contends that HUD's interpretation of Section 8 is entitled to no deference because HUD's rationale for the Rule is inadequate. In this regard, Appellee challenges a response HUD made when issuing the Rule in 1990 to one particular public comment. That comment asked why the Rule did not reflect the policies in 42 U.S.C. § 1437d(*l*)(5) (current version at 42 U.S.C. § 1437d(*l*)(6)) of the public housing statute, which at the time stated that each PHA was to use leases that provided that "criminal activity, including drug-related criminal activity, on or near the premises" shall be cause for termination of tenancy. 55 Fed.Reg. at 28539–40.

In its response, HUD pointed out that 42 U.S.C. § 1437d(*l*)(5) did not apply to or affect its authority to promulgate policies for Section 8 programs, and went on to explain that:

> The Department has not limited the proscribed activities under this rule to activities carried out on or near the premises. Section 8 certificates and housing vouchers are very mobile forms of housing assistance. The holder can lease suitable housing with federal assistance anywhere in the PHA's jurisdiction, in the metropolitan area, or in a contiguous metropolitan area. If a PHA were [only] permitted to terminate assistance for activities on or near the assisted premises, the deterrent effect of this policy would be substantially diminished because the family could lease

housing outside the area where the family member engages in the proscribed activities.

*Id.* at 28539–40. Appellee roundly criticizes HUD for "invok[ing] the mobility concept" of Section 8 assistance in this passage and then "commit[ing] a logical sleight of hand, as it switches to a different, wholly irrelevant definition of mobility ... that of a tenant who lives in one community, and commits crimes in another." (Appellee's Brief at 35).

■ While we would agree that the adequacy of an agency's reasoning when engaged in rule-making bears upon a court's evaluation of the agency's statutory interpretation, *see Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981), we find no merit in Appellee's argument. In our view, HUD's rationale makes sense, when considered in context. In the Rule, HUD granted a PHA the authority to deny Section 8 benefits to violent criminal actors. If HUD had burdened a PHA's authority to terminate such benefits with 42 U.S.C. § 1437d(*l*)(5)'s standard, HUD would have required a PHA to continue in its Section 8 program some of the very same persons it had authorized the PHA to exclude. Moreover, because a participant may move from unit to unit with his Section 8 assistance, HUD was concerned that if a PHA could only terminate benefits when a participant engaged in violent criminal activity "on or near the premises", a participant whose violent criminal activity occurred elsewhere would not only continue to receive Section 8 subsidies when his lease ended, but would also be able to move to a subsidized unit in another locality. For HUD, such a result was understandably unacceptable. We, therefore, reject Appellee's contention that the Rule reflects a fatal lapse in HUD's reasoning.

Appellee also asserts that the Regulations are flawed because it gives a PHA broader powers in connection with Section 8 housing, where a PHA is a mere administrator, than it does in connection with the public housing statute, where a PHA is both administrator and landlord. Here too, Appellee misses the mark. As HUD observed when issuing the Rule, private owners who do not live on the premises or who face

high vacancy rates may not be motivated to avoid or cease renting to undesirable tenants. *See* 55 Fed.Reg. at 28538. We, therefore, can see how HUD believes that a PHA's role as administrator of Section 8 benefits takes on added significance precisely because it is not the landlord of Section 8 units.

In essence, this and Appellee's other argument against the Regulations really focus on the wisdom of HUD's judgment. As *Chevron* teaches, however, such challenges are insufficient to deny deference to an agency's administrative interpretation of a statute. *Chevron*, 467 U.S. at 866, 104 S.Ct. 2778. Rather, the deference this court owes to the Regulations HUD has promulgated depends on "whether [HUD's policy] is a reasonable choice within a gap left open by Congress...." *Id.* As we noted, it is this Nation's policy in the Housing Act to use public resources to alleviate the shortage of decent, safe and affordable dwellings for low income families, and to aid the PHAs in the execution of their duties. *See* 42 U.S.C. § 1437(a)(1)(A)–(C). As we also noted, when HUD issued the Rule, it believed that the Rule's policies would further the Housing Act's objectives because those who wish to participate and remain in Section 8 programs would be encouraged to refrain from violent criminal activity. 55 Fed.Reg. at 28538–39. We find HUD's views in this regard to be reasonable. Because under the Regulations, PHAs are given relatively wide latitude to exclude violent criminal actors from Section 8 programs, where benefits attach to tenants, it is reasonable for HUD to expect that the distribution of benefits, the pool of owners in the private sector who are willing to consider renting to Section 8 participants, and the quality and safety of Section 8 housing are all greatly enhanced.[16]

16. We are certainly in accord with the concern that Justice Saylor expresses in his concurring opinion that the term "reasonable", when used by a reviewing court in this context, can suggest that the court is substituting its judgment for that of the agency which has been delegated the authority to make a policy choice within a gap left open by Congress. In discussing *Chevron's* second step, we have chosen to use the language the United States Supreme Court used in its opinion, see *Chevron*, 467 U.S. at 865–66, 104 S.Ct. 2778, and in applying that step, we have been careful to follow the Court's admonition to focus on

This brings us to whether the Rule and the Regulations would be acceptable to Congress. *Chevron,* 467 U.S. at 844–45 & n. 14, 104 S.Ct. 2778. In this vein, we find it significant that Congress, " 'presumed to be aware' " of HUD's interpretation of Section 8 in the Rule and Regulations, has done nothing to change the statute, even though it has amended Section 8 several times in other ways since HUD issued them. *See HUD v. Rucker,* 535 U.S. 125, 122 S.Ct. at 1234 n. 4, 152 L.Ed.2d 258 (quoting *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)); Explanatory notes to 42 U.S.C. § 1437f, describing amendments in 1994, 1995, 1996, 1997, 1998, 1999, and 2000. Moreover, it only stands to reason that Congress would accept a PHA's ability to terminate benefits without § 1437f(d)(1)(B)(iii)'s standard, inasmuch as it has given a PHA the power to deny Section 8 assistance to violent criminal offenders without that burden in the first place. *See* 42 U.S.C. § 13661(c). Thus, we conclude that the Regulations, insofar as they do not contain § 1437f(d)(1)(B)(iii)'s standard, are a "permissible construction" of Section 8, and entitled to our deference. *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778.

Accordingly, we hold that a PHA may terminate Section 8 benefits for the violent criminal activity of a family member without having to prove that the violent criminal activity threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or threatens the health, safety, or right to peaceful enjoyment of their residences of persons residing in the immediate vicinity of the Section 8 premises.[17]

The judgment of the Commonwealth Court is reversed, and this case is remanded to the court of common pleas for further proceedings consistent with this opinion, including a determi-

HUD's exercise of the policy making responsibilities that Congress has given it. *See id.*

17. We decline to address the other issues the Authority raised in this appeal which are rendered moot by our holding. We also decline to address any of the issues Appellee raised in her December 1998 statutory appeal in the court of common pleas which the court did not address.

nation of any unresolved issues that have been properly raised and preserved.

Chief Justice ZAPPALA did not participate in the consideration or decision of this case.

Justice NIGRO and Justice SAYLOR file concurring opinions.

Justice NIGRO, concurring.

I join in the holding and analysis of the majority, and write separately solely to emphasize that although HUD regulations authorize a PHA to terminate Section 8 benefits for violent criminal activity of a family member, they by no means *require* PHAs to do so. *Compare* 24 C.F.R. § 982.553(b)(1)(ii)(PHA "must immediately" terminate assistance when a household member has been convicted of drug-related criminal activity on the premises of federally assisted housing) *with* 24 C.F.R. § 982.553(b)(2)(PHA need only establish standards that "allow" the PHA to terminate assistance if a household member has engaged in violent criminal activity). In fact, the regulations make clear that in exercising its discretion to determine whether to terminate assistance, the PHA:

> may consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure.

24 C.F.R. § 982.552(c)(2)(i). Moreover, when only certain family members are culpable for the criminal activity giving rise to the threat of termination, the PHA is specifically authorized to:

> impose, as a condition of continued assistance for other family members, a requirement that other family members who participated in or were culpable for the action or failure will not reside in the unit. The PHA may permit other

members of a participant family to continue receiving assistance.

24 C.F.R. § 982.552(c)(2)(ii).

Given these additional regulations, I believe that it is incumbent on PHAs to consider "all relevant circumstances" before terminating a family's assistance based on the errant conduct of less than all of its members.

Justice SAYLOR, concurring.

I join the majority opinion generally, subject to the following:

First, I read the majority's issue-narrowing logic, *see* Majority Opinion, at 1209–10, as merely an indication that the Court is limiting its review to the correctness of the reasoning of the Commonwealth Court and common pleas court, leaving open other questions concerning the validity of the HUD regulations at issue and the underlying administrative action of the PHA in terminating Appellee's Section 8 benefits.

Second, although I acknowledge that, like the majority, the United States Supreme Court has employed the yardstick of "reasonableness" in delimiting the class of substantive regulations that are due the greatest judicial deference, I believe that, given the broader context, it would be preferable to employ the term "reasoned." In this regard, where, as here, there is an express Congressional delegation of lawmaking authority to an administrative agency, *see* Majority Opinion, at 1208 (citing 42 U.S.C. § 3535(d)), the Supreme Court has maintained that resultant legislative regulations must be accorded controlling weight "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *accord* 5 U.S.C. § 706(2)(A).[1] Notably, this Court has distinguished

1. Significantly, in its analysis, *Chevron* ultimately found and relied on an implicit delegation of legislative authority to support broad deference in favor of an administrative regulation. *Chevron* 467 U.S. at 865–66, 104 S.Ct. at 2792–93. The Court treated the case for broad deference in the face of an express delegation as settled, *see id.* at 843–

similar conceptions from reasonableness review in our own administrative jurisprudence. *See Fraternal Order of Police v. PLRB,* 557 Pa. 586, 592–93, 735 A.2d 96, 99–100 (1999). *See generally* Ronald M. Levin, *The Anatomy of Chevron: Step Two Reconsidered,* 72 Chi.-Kent L.Rev. 1253, 1263 (1997) ("in effect, the [Supreme C]ourt has transformed the *Chevron* step two question of whether the agency action was 'reasonable' into a question of whether it was 'reasoned.'"). While superficially this may seem a modest point, the employment of the elastic reasonableness rubric in the administrative arena has in the past led to divergent results and carries the potential for fostering the appearance that courts may be substituting their judgments for those of agencies, rather than limiting review to a determination whether the agency has acted within the boundaries of its lawful mandate. *Cf. Fraternal Order of Police,* 557 Pa. at 592–93, 735 A.2d at 99–100.

Phrased as such, I agree with the majority that HUD's legislative regulations in this area are reasoned, a permissible application of delegated authority under the Housing Act, and not arbitrary, capricious, or *ultra vires* on their face, where: national housing policy is intended to remedy unsafe housing conditions, *see* 42 U.S.C. § 1437(a)(1)(A); tenancy of households whose members have engaged in violent criminal activity, regardless of its proximity, may reasonably be viewed as contrary to such policy; and, as Mr. Justice Nigro emphasizes, the regulations do not require termination, but rather, on their terms implicate the sound discretion of the local housing authority.

------

44, 104 S.Ct. at 2782, and, obviously, the strongest justification for deference is presented in such circumstances, as here.